IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CINGULAR WIRELESS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 6250 |
| | ) | |
| OMAR AHMAD, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Omar Ahmad's ("Ahmad") motion for summary judgment. For the reasons stated below, we grant the motion for summary judgment.

**BACKGROUND**

Plaintiff Cingular Wireless LLC ("Cingular"), alleges that in 2001 it entered into a Reseller Agreement ("2001 Agreement") with PlatinumTel Communications, LLC ("PTC"). Under the terms of the 2001 Agreement, Cingular was allegedly obligated to provide PTC with mobile telephone services, which PTC would then re-sell to end users. In exchange, PTC allegedly promised to pay Cingular in accordance with a pay schedule in the 2001 Agreement. According to

1

Cingular, on November 6, 2001, Ahmad, Chief Executive Officer of PTC, entered into a guaranty agreement ("Guaranty"), under which Ahmad personally guaranteed to Cingular prompt and full payment of any indebtedness owed to Cingular under the 2001 Agreement. In May 2003, Cingular allegedly entered into another Reseller Agreement ("2003 Agreement") with PTC, which Cingular contends was merely a renewal of the 2001 Agreement. Cingular claims that PTC failed to pay for services received and that PTC owes in excess of $4,500,000. Cingular brought the instant action solely against Ahmad, including in the complaint a breach of contract claim based upon an alleged breach of the Guaranty by Ahmad. Ahmad moves for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant

has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

Cingular argues that the 2003 Agreement is merely a renewal, or a modification, of the 2001 Agreement. According to Cingular, the Guaranty, which related to the 2001 Agreement, continued to apply to any debts PTC incurred under the 2003 Agreement. Ahmad argues that the 2003 Agreement was a new agreement and that he cannot be held personally liable since the Guaranty applied only to the 2001 Agreement. Under Illinois law, the parties can modify an existing contract as long as the parties "*agree* to alter a contractual provision or to include additional

3

obligations, while leaving intact the overall nature and obligations of the original agreement." *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004)(emphasis added); *see also Thomas v. Garrett*, 456 S.E.2d 573, 574-75 (Ga. 1995)(stating that "[i]t is clear, however, that the modification of a contract may be accomplished by a subsequent mutual agreement of all the parties thereto").

I. Terms of Agreements and Guaranty

Cingular argues that the terms of the 2001 Agreement, the 2003 Agreement, and the Guaranty show that the 2003 Agreement is a renewal or modification of the 2001 Agreement. Ahmad argues that the terms of the 2001 Agreement, 2003 Agreement, and Guaranty clearly indicate that the 2003 Agreement is an entirely separate and new agreement. Cingular points out that the Guaranty provides that the obligation of Ahmad under the Guaranty is "absolute, continuing and unlimited" and that Ahmad's obligations under the Guaranty are not diminished by "[a]ny renewal, extension, modification or rearrangement in connection with the" obligations under the 2001 Agreement. (C. Ex. H. Par. 2, 4(e)).

Ahmad points out, on the other hand, that the 2001 Agreement had a four year term. (R O SF Par. 15). The Guaranty provides that the guaranty of Ahmad is made in connection with "certain Authorized RESELLER Four Year Customer Sales Agreements. . . ." (R O SF Par. 14). Cingular admits, however, that the 2003 Agreement had a term of three years. ( R OSF Par. 21). The 2003 Agreement is thus not one of the "Four Year Customer Sales Agreements" contemplated in the

4

Guaranty. (R O SF Par. 14). Cingular also concedes that the debt that is the subject of the instant action was not incurred during the term of the 2001 Agreement and was instead incurred during the term of the 2003 Agreement. (R OSF Par. 28).

Cingular also concedes that the Guaranty also provides that the term "Agreement" is to be used to reference the 2001 Agreement and that Ahmad guarantees indebtedness in "connection with RESELLER'S performance of the Agreement." (R OSF Par. 13). Thus, the Guaranty specifically ties itself solely to the 2001 Agreement and not to separate future agreements.

Another indication that the 2003 Agreement was not a renewal or modification of the 2001 Agreement is the fact that the 2001 Agreement contained a specific provision that provided a mechanism for renewal. (R OSF Par. 16). Thus, when entering into the 2001 Agreement the parties contemplated such a provision as the appropriate manner in which to renew the 2001 Agreement. Cingular concedes that it never exercised the renewal option in the 2001 Agreement. (R OSF Par. 17).

Finally, and perhaps most importantly, the 2003 Agreement contains a clause that states the following:

> *Any prior written or oral agreements* between the parties with respect to this subject matter for the territory shown on schedule two, *along with any amendments or attachments to such agreements*, shall be superseded by this agreement and shall be of no force and effect. This agreement may not be modified or otherwise amended except by written consent of both parties.

(R OSF Par. 23)(emphasis added). Thus, the 2003 Agreement is unambiguous in that it supercedes all prior agreements. If, as Cingular contends, the 2003 Agreement

was a renewal or modification of the 2001 Agreement, there would not be a need for such a provision. The statement that the 2003 Agreement supercedes all prior agreements is in fact directly contrary to Cingular's position that the 2003 Agreement was merely intended to modify in part the 2001 Agreement. The clause also makes clear that the 2003 Agreement is not a modification of the 2001 Agreement since it states that it supercedes "any amendments" of prior agreements. The clause does not, for example, state "any other amendments" or contain any language that would indicate that the clause is itself being included in an amendment of a prior agreement. Thus, the terms of the 2001 Agreement, the 2003 Agreement, and the Guaranty clearly indicate that the 2003 Agreement was a new agreement rather than a renewal or modification of the 2001 Agreement.

II. Other Evidence

Ahmad argues that even if we were to consider the terms of the 2001 Agreement, the 2003 Agreement, and the Guaranty to be ambiguous, other evidence indicates that the 2003 Agreement was not a renewal or modification of the 2001 Agreement. Ahmad argues that the terms of the 2001 Agreement and the 2003 Agreement significantly differ, that Cingular's own witnesses fail to corroborate Cingular's position, that the 2003 Agreement was part of Cingular's efforts to standardize contracts among its new customer base, and that Cingular asked Ahmad to sign a new guaranty along with the 2003 Agreement.

6

A. Different Terms in Agreements

Ahmad contends that the terms of the 2003 Agreement are significantly different than those in the 2001 Agreement, which indicates that the 2003 Agreement is a new agreement. Cingular concedes that the 2003 Agreement covers operations in a broader territory than the 2001 Agreement. (R OSF Par. 29). Cingular also concedes that the 2003 Agreement includes a different pricing structure and has a different term period. (R OSF Par. 30-31). There is also no dispute that, unlike the 2001 Agreement, the 2003 Agreement includes an arbitration clause, addresses the allocation of telephone numbers in the event of a shortage, and requires Cingular to obtain consent to assign its duties. (R OSF Par. 33-35). Finally, Cingular admits that the 2001 Agreement provided that it was governed by Illinois law and the 2003 Agreement provided that it was governed by Georgia law. (R OSF Par. 32). Thus, even to the extent that some of the same terms in the 2001 Agreement were used in the 2003 Agreement, the legal meaning of every term was altered from the 2001 Agreement because all such terms took on the meaning and legal ramifications accorded to them under Georgia law rather than Illinois law. Thus, it is clear that the terms in the 2003 Agreement are significantly different than the 2001 Agreement, indicating that the parties did not intend in 2003 merely to renew a prior agreement or to make some modifications to some terms of a prior agreement.

B. Testimony of Cingular Employees About 2003 Agreement

Cingular admits that Ahmad requested that Cingular produce corporate

witnesses pursuant to Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") to address certain topics. (R OSF Par. 38). Cingular concedes that topic numbers 16 and 18 identified in Ahmad's discovery requests addressed the facts surrounding the renewal issue and the issue concerning the amounts allegedly owed by Ahmad to Cingular. (R OSF Par. 39, 41). Cingular admits that it produced the following witnesses to address topic numbers 16 and 18: Malik Herron ("Herron"), Greg Jones ("Jones"), and Tahoana Taylor ("Taylor"). (R OSF Par. 42, 44-46). Cingular also indicated that Harold Slaughter ("Slaughter") had certain pertinent information. (R OSF Par. 47). However, Cingular has not pointed to any testimony by the Rule 30(b)(6) witnesses or by Slaughter that shows that they understood that the 2003 Agreement was either a modification or a renewal of the 2001 Agreement.

For instance, it is undisputed that the 2003 Agreement was entered into on May 7, 2003. (R OSF Par. 20). Herron testified that he did not realize that the Guaranty applied to the 2003 Agreement until "sometime towards the end of 2003." (Heron Dep. 99). If Cingular was merely continuing the 2001 Agreement in May 2003, it should have been evident at that time that the Guaranty would continue to apply. The testimony by Herron that he realized "sometime towards the end of 2003" that the Guaranty would apply to the 2003 Agreement is consistent with Ahmad's contention that Cingular decided to take its current position after it executed the 2003 Agreement as part of a strategy to collect the funds owed under the 2003 Agreement. Cingular also admits, pursuant to Local Rule 56.1, that "Ahmad was not even told until 2005 that Cingular's official position was that the

8

2001 Guaranty applied to the 2003 Reseller Agreement." (R OSF Par. 54). This again supports Ahmad's contention that the parties understood on May 7, 2003, with the execution of the 2003 Agreement, that a new agreement was being formed and that Cingular subsequently changed its position so that it could attempt to collect funds owed under the 2003 Agreement.

### C. Standardization of Contracts

Ahmad argues that in 2003 when the parties entered into the 2003 Agreement, Cingular "wanted to standardize the contracts across its new customer base as part of its corporate plan, and therefore[,] began an aggressive plan to extinguish old contracts and to create a new, uniform set of contracts." (R OSF Par. 19)(Slaughter Dep. 15-17). Cingular agrees to some of the facts regarding the standardization plan and does not dispute the remaining facts. (R OSF Par. 19). To the extent that Cingular impliedly seeks to dispute the facts, Local Rule 56.1 precludes Cingular from avoiding a direct response. *See Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003)(indicating that evasive denials that do not directly oppose an assertion are improper and thus the contested fact is deemed to be admitted pursuant to Local Rule 56.1). Cingular also contends that the sources cited by Ahmad do not support the facts, but the sources cited by Ahmad do provide support for the facts involving the standardization plan. (OSF Par. 19). For example, Herron testified regarding the standardization plan, stating that Cingular had entered into a merger and thus had "agreements that came from different sources" and that Cingular

9

wanted to have consistent terms in all of its reseller agreements. (Herron Dep. 67-68). Slaughter also testified regarding the plan. (Slaughter 15-17). The fact that Cingular had a corporate-wide plan to extinguish existing contracts and make the new contracts consistent with standardized terms is deemed admitted pursuant to Local Rule 56.1. The undisputed fact that Cingular had a standardization plan supports Ahmad's contention that Cingular intended to enter into a new agreement in 2003 that adopted the standardized terms desired by Cingular. The fact that the 2003 Agreement contained significantly different terms than the 2001 Agreement is further support of the conclusion that the 2003 Agreement was a new agreement that was intended to contain new standardized terms. Thus, Cingular's standardization plan indicates that the 2003 Agreement was a new agreement.

### D. Request for New Guaranty

Ahmad also contends that in 2003 Cingular asked Ahmad to sign a new guaranty along with the 2003 Agreement and Ahmad refused. Cingular contends that the only evidence of such an offer is Ahmad's own self-serving statements. However, Cingular has not presented any testimony or other evidence to contradict Ahmad's contentions. If Cingular did ask Ahmad to sign a new guaranty in 2003, that would be further evidence that Cingular considered the 2003 Agreement a new agreement. Otherwise there would be no need for a new guaranty since the Guaranty was connected to the 2001 Agreement. Regardless of whether Cingular asked Ahmad to sign a new guaranty, there is ample evidence to support Ahmad's motion

aside from Ahmad's claims about the request to sign a new guaranty in 2003. The terms of the 2001 Agreement, the 2003 Agreement, and the Guaranty unquestionably show that the 2003 Agreement was a new agreement. Likewise, the record also contains additional evidence that shows the 2003 Agreement to be a new agreement. Cingular has been allowed to conduct discovery in this matter and yet has virtually no evidence, even when taking into consideration the deposition testimony of its own witnesses, upon which to base its claims. Based upon the record before us, no reasonable trier of fact could conclude other than that the 2003 Agreement was a new agreement and that the Guaranty did not apply to the 2003 Agreement. Ahmad offered his personal guarantee only as to the 2001 Agreement. If Cingular desired a guaranty to cover the 2003 Agreement, then it was incumbent upon Cingular to obtain such a guaranty at that time. Cingular cannot now, in retrospect, invoke the unrelated Guaranty in order to recoup its losses under the 2003 Agreement from Ahmad. Therefore, we grant Ahmad's motion for summary judgment.

## CONCLUSION

Based on the foregoing analysis, we grant Ahmad's motion for summary judgment.

_Samuel Der-Yeghiayan_
Samuel Der-Yeghiayan

Dated: May 16, 2007  United States District Court Judge